1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8   MATTHEW WRIGHT,

9                          Plaintiff,              Case No. C20-1452-JCC-MLP

10          v.

11   STATE OF WASHINGTON, *et al.*,                REPORT AND RECOMMENDATION

12                          Defendants.

13

14          **I.    INTRODUCTION AND SUMMARY CONCLUSION**

15          This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff Matthew Wright

16   is currently confined at the Monroe Correctional Complex ("MCC") -Twin Rivers Unit ("TRU").

17   Plaintiff alleges in his amended complaint violations of federal and state law arising out of the

18   alleged denial of adequate mental health care and medically necessary accommodations. (*See*

19   Am. Compl. (Dkt. # 26).) Defendants in this action are: the State of Washington; the Washington

20   State Department of Corrections ("DOC"); Arthur G. Davis, Ph.D., clinical psychologist at MCC

21   at times relevant to this action; Dr. Karie Rainer, DOC Director of Mental Health; and Jennifer

22

23

REPORT AND RECOMMENDATION
PAGE - 1

Watanabe, a psychology associate at MCC at times relevant to this action. (*See id*. at 2-3.)

Plaintiff seeks an award of damages for the alleged violations of federal and state law. (*Id*. at 26.)

Defendants now move for summary judgment, seeking dismissal of all claims asserted by Plaintiff in his amended complaint. Plaintiff opposes Defendants' motion. The Court, having reviewed Defendants' motion, all related briefing, and the balance of the record, concludes that Defendants' motion for summary judgment should be granted and that Plaintiff's amended complaint and this action should be dismissed with prejudice as to Plaintiff's federal claims and without prejudice as to Plaintiff's state law claims.

## II.     BACKGROUND

### A.     Procedural History

Plaintiff initially filed his complaint in Snohomish County Superior Court in August 2020. (Pl.'s Compl. (Dkt. # 1-2).) Plaintiff asserted therein an Eighth Amendment deliberate indifference claim, a First Amendment retaliation claim, and state law negligence claims. (*See id*.) Plaintiff identified as Defendants in his original complaint the State of Washington, the Washington DOC, Dr. Arthur Davis, DOC Director of Mental Health Dr. Karie Rainer, and MCC Psychology Associate Jennifer Watanabe. (*Id*. at 1, 3.) Defendants subsequently removed the case to this Court. (Dkt. # 1.)

In February 2021, Plaintiff sought leave to amend his complaint to add a new Defendant and new claims to this action. (Dkt. # 16.) Specifically, Plaintiff sought to add Elke Jackson, a Health Care Manager at MCC to add a claim under the Americans with Disabilities Act ("ADA")/Rehabilitation Act ("RA") against the DOC. (*Id*. at 1-2.) Defendants opposed Plaintiff's motion to amend (dkt. # 19), and the Court ultimately granted Plaintiff's motion with

REPORT AND RECOMMENDATION
PAGE - 2

respect to his request to add an ADA/RA claim to this action but denied the motion with respect to his request to add Elke Jackson as a Defendant (dkt. # 25).

Defendants filed the instant motion for summary judgment on October 8, 2021 (Defs.' Mot. (dkt. # 30)), together with declarations and accompanying exhibits from Defendants' counsel, Timothy Feulner (Feulner Decl. I (dkt. # 31), Exs. (dkt. # 31-1)), and from Dr. Davis. (Davis Decl. (dkt. # 32), Exs. (dkt. # 32-1)). Plaintiff filed his opposition to Defendants' motion on November 1, 2021. (Pl.'s Resp. (dkt. # 33).). Plaintiff's response included declarations and accompanying exhibits from Plaintiff's counsel, Darryl Parker (Parker Decl. (dkt. # 33-1), Exs. (dkt. # 33-2)) and from Plaintiff (Pl.'s Decl. (dkt. # 33-3), Exs. (dkt. # 33-4)), as well as a declaration from Plaintiff's sister, Theodora Wright (T. Wright Decl. (dkt. # 33-5)). Defendants filed a reply brief in support of their summary judgment motion on November 5, 2021 (Defs.' Reply (dkt. # 34)), together with a second declaration and accompanying exhibits from Defendants' counsel (Feulner Decl. II (dkt. # 35), Ex. (dkt. # 35-1)), and declaration and accompanying exhibits from Ms. Watanabe (Watanabe Decl. (dkt. # 36), Ex. (dkt. # 36-1)) and MCC-TRU Resolution Specialist Brandi Blair (Blair Decl. (dkt. # 37), Ex. (dkt. # 37-1)).

### B.    Factual History

Plaintiff entered DOC custody in March 1994, and has been housed at the TRU since January 2004. (Feulner Decl. I, Ex. at 3 (Wright Dep. at 9:13-20); Pl's Decl. at ¶ 2.) Plaintiff did not seek any mental health treatment from the DOC between 1994 and 2017. (Feulner Decl. I, Ex. at 4 (Wright Dep. at 11:17-19).) In mid-June 2018, Plaintiff began experiencing symptoms of insomnia, increased anxiety, unexpected weight loss, a racing heart, and headaches, symptoms which he attributed to stress related to a lawsuit he filed against the State of Washington, the

REPORT AND RECOMMENDATION
PAGE - 3

DOC, and several state and DOC employees in June 2018 that prompted him to seek mental health treatment. (*See* Pl.'s Decl. at ¶¶ 10-11; *see also* Am. Compl. at ¶¶ 18-19.) That lawsuit, filed by Plaintiff with the assistance of his attorney, arose out of a family situation that had been ongoing since 2016 involving Plaintiff's ex-wife and his children, and it was apparently Plaintiff's sister who urged him to seek professional help for the stress associated with the lawsuit and events giving rise to the lawsuit. (*See* Pl.'s Decl. at ¶ 9, 11; *see also* T. Wright Decl. at ¶ 12.)

In early January 2019, Dr. Davis became aware that Plaintiff was asking to be seen by mental health, apparently as a result of a kite submitted by Plaintiff, and Plaintiff was seen by Dr. Davis on January 14, 2019.[1] (Davis Decl. at ¶ 5, Ex. at 2.) The primary encounter report of this appointment indicates that during this session with Dr. Davis, Plaintiff was primarily focused on his legal problems with DOC and stress related to those legal issues. (Davis Ex. at 2.) In addition to providing Dr. Davis considerable detail regarding his legal case, and associated fears of retaliation from DOC staff relating to his lawsuits, Plaintiff also told Dr. Davis, "I don't know why I'm here. My lawyer told me to talk to MH, but I don't know why, I don't need to talk to anybody, I need help." *Id*. Plaintiff went on to indicate that he wanted to return to mental health. (*Id*.)

---

[1] The record reflects that Plaintiff sent a kite to "Mental Health D-Unit" on January 8, 2019, stating "[p]lease call me out to talk," (*see* Davis Ex. at 4), but it is not clear from the record whether this was the kite that put Dr. Davis on notice that Plaintiff was seeking mental health care. Dr. Davis states in his declaration that he did not receive this particular kite until January 22, 2019, and that he responded the same day. (*See* Davis Decl. at ¶ 5.) This representation is confusing given that Dr. Davis had already seen Plaintiff for the first time when the response was purportedly written, yet Dr. Davis made no reference therein to the fact that he had already seen Plaintiff, and in fact, had advised Plaintiff to watch for his appointment on the "call out." (Davis Ex. at 4.)

REPORT AND RECOMMENDATION
PAGE - 4

1   Based on Plaintiff's presentation during the appointment, Dr. Davis determined that

2   Plaintiff was not suffering from any serious mental illness but was instead describing issues

3   "more in line with situational stressors." (Davis Decl. at ¶ 5.) The encounter report itself

4   indicates that Dr. Davis had deferred his diagnosis and that Plaintiff should return to complete a

5   mental health update which Dr. Davis noted in the report was overdue.[2] (Davis Ex. at 2.)

6   Plaintiff met with Dr. Davis again on January 29, 2019. (Davis Decl. at ¶ 7, Ex. at 6.) The

7   primary encounter report of the visit reflects that this was a follow-up to Plaintiff's prior

8   appointment for purposes of continuing Plaintiff's assessment "given the enormous content of

9   expression, institutional complaints, [and] legal involvements" discussed during the initial

10  session. (Davis Ex. at 6.) Dr. Davis also noted in the encounter report that Plaintiff's sister and

11  his attorney, both of whom Plaintiff spoke to on a daily basis, had encouraged him to speak to

12  someone in mental health. (*Id*.) According to Dr. Davis, Plaintiff continued to focus on his legal

13  cases and complaints against the DOC during this second appointment. (Davis Decl. at ¶ 7, Ex. at

14  6.) Plaintiff also continued to express an interest in seeing mental health while also indicating he

15  did not want to see mental health because he did not want things documented. (*See id*.)

16  Based on Plaintiff's presentation at the second appointment, Dr. Davis again concluded

17  that Plaintiff was not suffering from any kind of serious mental illness. (Davis Ex. at 6.) The

18

19  [2] Though Dr. Davis indicated in his initial encounter report that Plaintiff was overdue for a mental health
    update, it does not appear that such an update was required in Plaintiff's case. According to DOC policy,

20  mental health updates are required only for inmates who have an "S" code of 2 or higher. (*See* Feulner
    Decl. I, Ex. at 213-14 (Mental Health Services Policy at Directive III.B.2).) Dr. Davis explains in his

21  declaration that S-codes are assigned to each DOC inmate as a part of a comprehensive health screening.
    (Davis Decl. at ¶ 13.) The S-code indicates an inmate's level of mental health functioning and the level of
    mental health services needed. (*Id*.) At the time Plaintiff was assessed by Dr. Davis, he had an S-code of

22  1, which represents the highest level of mental functioning. (*See id*.) DOC policy therefore did not
    mandate that a mental health update be completed.

23

REPORT AND RECOMMENDATION
PAGE - 5

encounter report of this appointment indicates that Dr. Davis again deferred any diagnosis, but this time included an entry that read "Rule Out Adjustment Disorder with anxiety and depression v. GAD." (*Id*.) The report indicated as well that Plaintiff should return to complete a mental health update. (*Id*.)

Plaintiff submitted additional kites to mental health between the end of January 2019 and March 2019 requesting an assessment and expressing frustration over the delay. (Davis Decl. at ¶¶ 8-11, Ex. at 8-14.) Plaintiff did not see Dr. Davis for any follow-up or for the anticipated mental health update in the ensuing months, and on July 15, 2019, Plaintiff filed a grievance regarding the lack of timely follow-up by Dr. Davis. (*See* Pl.'s Decl. at ¶¶ 16, 18.) On August 5, 2019, Plaintiff met with MCC-TRU Investigator Jamie Gallagher who was assigned to investigate his grievance. (*Id*. at ¶ 18; Parker Ex. at 11.) Ms. Gallagher confirmed that Dr. Davis never scheduled a follow-up appointment with Plaintiff despite indicating he would do so, and she made arrangements for Plaintiff to be seen by a new provider, Ms. Watanabe, the following week. (Parker Ex. at 11.)

On August 8, 2019, the day Ms. Gallagher completed her grievance investigation report, and several days before Plaintiff was to see his new provider, Dr. Davis called Plaintiff to his office and offered to do a mental health assessment. (Pl.'s Decl. at ¶ 19; Davis Decl. at ¶ 12.) According to Plaintiff, Dr. Davis "demanded" to do the assessment, but Plaintiff advised him he had been assigned a new provider and wanted to wait for an assessment with this individual. (Pl.'s Decl. at ¶ 19.) Plaintiff claims Dr. Davis refused to let him leave the office until he was required to return for count and physically blocked the door to prevent him from leaving the room. (*Id*.).

REPORT AND RECOMMENDATION
PAGE - 6

Dr. Davis, in contrast, recalls asking Plaintiff to wait to leave his office until an officer was notified and telling Plaintiff he would escort him out. (Davis. Decl. at ¶ 12.) Dr. Davis indicates that he then explained to Plaintiff that this was the process required when an inmate left his office during a non-movement period. (*Id.*) According to Dr. Davis, he also asked Plaintiff to slow his speech and give him an opportunity to understand his concerns, at which point Plaintiff stayed and became more pleasant. (*Id.*) While Dr. Davis did not conduct any formal assessment of Plaintiff during this August 8, 2019 interaction, he nonetheless notes that Plaintiff did not appear at that time, or during his other clinical sessions, to suffer from significant mental health symptoms. (*Id.* at ¶ 13.)

On August 16, 2019, Plaintiff was seen by his new provider, Ms. Watanabe.[3] (Watanabe Decl. at ¶ 6, Ex. at 5.) Plaintiff reported to Ms. Watanabe that he was seeking mental health assistance because of trouble sleeping and excessive worry, and he described being overwhelmed with stressors including conflict with DOC staff and concerns about his family outside of prison. (*Id.*) According to Ms. Watanabe, Plaintiff was very focused on his complaints about Dr. Davis and on his lawsuits. (Watanabe Decl. at ¶ 6.) Plaintiff also mentioned during the session that his attorney had requested he seek out mental health treatment. (*Id.*) When asked about his current mental health symptoms, Plaintiff reported to Ms. Watanabe that he was "doing pretty good right now. I am positive." (*See id.*; Watanabe Ex. at 5.) Plaintiff also reported that his situational

---

[3] Ms. Watanabe had seen Plaintiff on one prior occasion, in June 2017, when she received an emergent referral for a mental health assessment from DOC headquarters after a family member of Plaintiff contacted the DOC and expressed concerns regarding Plaintiff's children and an upcoming family visit. (*See* Watanabe Decl. at ¶ 5, Ex. at 2.) Ms. Watanabe assessed Plaintiff and determined that he did not meet the diagnostic criteria for a mental health disorder and did not need ongoing mental health treatment. (*Id.*)

REPORT AND RECOMMENDATION
PAGE - 7

stressors had largely been resolved and that he was seeking mental health services to learn how to cope with anxiety and issues related to sleep disturbances. (*Id.*)

Based on her assessment of Plaintiff during the appointment, Ms. Watanabe concluded that Plaintiff did not have any diagnosable mental health condition and that his functioning appeared to be fine based on his own reporting. (Watanabe Decl. at ¶ 7, Ex. at 5.) Plaintiff therefore did not meet the criteria for ongoing mental health treatment under the DOC's Offender Health Plan, but he was authorized to have three free sessions with mental health under the plan. (*Id.*)

Ms. Watanabe saw Plaintiff again on September 12, 2019. (Watanabe Decl. at ¶ 9, Ex. at 27.) Plaintiff began the session by venting his frustrations about what he perceived to be a missed appointment.[4] (*See id.*) Plaintiff thereafter continued to vent his frustration about not receiving the mental health care he believed he needed. (*Id.*) Plaintiff also expressed concern that Ms. Watanabe had not reviewed his prior mental health assessments from 1991, and he noted a prior diagnosis of posttraumatic stress disorder ("PTSD"). (*Id.*) Ms. Watanabe informed Plaintiff that there was no indication he was suffering from a mental health disorder, regardless of any previous diagnosis, and that she did not feel he needed to have a full mental health appraisal. (*See id.*) She also advised Plaintiff that she was willing to see him for his authorized three sessions to address coping strategies to address his current symptoms. (Watanabe Ex. at 27.)

---

[4] Although the primary encounter report for Plaintiff's August 16, 2019 appointment indicates that Plaintiff had been scheduled for another session on September 12, 2019 (Watanabe Ex. at 5), the day he was actually seen again by Ms. Watanabe, Plaintiff maintains that Ms. Watanabe told him he would be called out again on August 23, 2019 to finish the assessment. (Pl.'s Decl. at ¶ 21.)

REPORT AND RECOMMENDATION
PAGE - 8

Plaintiff expressed to Ms. Watanabe his belief that the three allotted sessions would not be enough for him, though Ms. Watanabe's observations of Plaintiff did not support that belief. (Watanabe Decl. at ¶ 9, Ex. at 27.) Following the session, Ms. Watanabe noted that Plaintiff's prognosis "appears fair due to some resistance in sessions as evidenced by his statements that individual therapy sessions will not be effective, his maintained focus on interpersonal conflict with staff and other offenders, and conflicting reports that he is doing better but 'needs' mental health treatment." (*Id*.) Ms. Watanabe did not see Plaintiff again after September 12, 2019. (Watanabe Decl. at ¶ 10.)

In January 2020, Plaintiff filed a grievance complaining about the absence of any mental health care since his September 2019 appointment with Ms. Watanabe and requesting that an outside mental health provider be hired to assess and treat him as needed. (Pl.'s Decl. at ¶ 29, Ex. at 49.) In response to that grievance, Plaintiff was scheduled to meet with a new provider, Dr. Christine Gomes. (*See* Pl.'s Ex. at 49; Feulner Decl. I, Ex. at 34.)

Plaintiff met with Dr. Gomes for the first time on February 24, 2020. (Feulner Decl. I, Ex. at 34.) At the beginning of the session, Plaintiff focused on the grievance he had submitted and the fact that he had been previously told he did not qualify for mental health services. (*Id*.) He also provided Dr. Gomes with a "very old" psychological evaluation which stated he had PTSD. (*Id*.) When asked to explain his current symptoms, Plaintiff was resistant at first but eventually began to do so after Dr. Gomes advised him that his mental health status 30 years ago was not as important as his current symptoms. (*Id*.) Based on Plaintiff's presentation during their session, Dr. Gomes noted that Plaintiff appeared to be experiencing anxiety and indicated she

REPORT AND RECOMMENDATION
PAGE - 9

would meet with him again in two weeks to begin completing a mental health appraisal and clarifying whether he met the criteria for an anxiety disorder. (*Id.*)

Dr. Gomes met with Plaintiff again on March 9 and March 17, 2020, to continue her assessment of his current symptoms. (Feulner Decl. I, Ex. at 35-36.) On March 9, 2020, Dr. Gomes raised Plaintiff's S-code from 1 to 2 given his reported anxiety symptoms. (*Id.* at 35.) On May 5, 2020, Dr. Gomes completed a mental health appraisal in which she indicated a diagnosis of PTSD and determined that Plaintiff would benefit from treatment targeting his symptoms of PTSD. (*Id.* at 39-44.) Dr. Gomes indicated that the treatment plan would include eight weekly sessions of cognitive behavioral therapy. (*Id.* at 38.) Plaintiff met with Dr. Gomes for his first weekly session on May 12, 2020, and they had additional sessions on May 19, May 27, June 11, June 15, June 17, June 22, June 29, July 6, July 13, July 20, and July 27, exceeding the originally planned eight sessions. (*Id.* at 47-58.)

During the June 29, 2020 session, Plaintiff brought up the issue of a tort claim he had filed on June 12, 2020, which related in part to Plaintiff's complaints about the adequacy of his mental health treatment and which he had disclosed to Dr. Gomes at the conclusion of his prior session. (*See* Feulner Decl. I, Ex. at 54; *see also id.* at 19 (Wright Dep. at 84:2-20), 183-88.) Dr. Gomes explained that she had consulted with Dr. Rainer, given Plaintiff's concerns about how the tort claim might affect his treatment, and advised that the tort claim was separate from his mental health treatment which could continue as planned. (*Id.* at 54.)

On July 14, 2020, Plaintiff requested that Dr. Gomes issue him a Health Status Report ("HSR") that would excuse him from work while he was going through therapy. (Pl.'s Ex. at 55.) Dr. Gomes advised Plaintiff that HSRs for "no work" were not written by mental health as they

REPORT AND RECOMMENDATION
PAGE - 10

were rarely medically necessary and would not be beneficial to him. (*See* Feulner Decl. I, Ex. at 59, 140 (Gomes Dep. at 65:6-19); Pl.'s Ex. at 55, 62-63.) Dr. Gomes nonetheless agreed to present Plaintiff's request for an HSR to the mental health care review committee ("MH-CRC"). (*See* Feulner Decl. I, Ex. at 59; Pl.'s Ex. at 62-63.)

Dr. Gomes presented Plaintiff's case and his request for an HSR to the MH-CRC on July 30, 2020. (Feulner Decl. I, Ex. at 59-60.) During her presentation to the MH-CRC, Dr. Gomes provided the committee with information regarding Plaintiff's course of treatment and also sought consultation from the other members of the committee regarding that treatment. (*Id*. at 61.) Members of the MH-CRC expressed several concerns, including that Plaintiff may be trying to force Dr. Gomes to treat him as he saw fit instead of being open to Dr. Gomes' feedback. (*Id*.) The MH-CRC also concurred with Dr. Gomes that Plaintiff appeared to be displaying more "personality psychopathy" and they questioned whether Plaintiff actually met the diagnostic criteria for PTSD. (*Id*.) The MH-CRC denied Plaintiff's request for an HSR and recommended that Dr. Gomes complete psychological testing in order to clarify Plaintiff's diagnosis before continuing with therapy. (*Id*.)

Dr. Gomes met with Plaintiff on August 3, 2020, and advised him that the MH-CRC had denied his HSR and had suggested he take some psychological tests. (Feulner Decl. I, Ex. at 62.) Plaintiff agreed to take the tests and completed them during the session, though he subsequently expressed concern that the tests would "make him look crazy" and that his ex-wife would use them against him. (*Id*.) Plaintiff claims that he agreed to the testing only because Dr. Gomes told him he could either accept her original diagnosis and receive no further treatment or submit to the testing for re-diagnosis. (Pl.'s Decl. at ¶ 36.)

REPORT AND RECOMMENDATION
PAGE - 11

On September 8, 2020, Dr. Gomes completed a mental health update for Plaintiff in which she summarized the results of the testing. (Feulner Decl. I, Ex. at 66-71.) Plaintiff was once again diagnosed with PTSD to which a diagnosis of antisocial personality disorder was added. (*Id*. at 72.) Following the testing that occurred in early August 2020, Dr. Gomes continued to conduct individual therapy sessions with Plaintiff on an almost weekly basis between August 19, 2020, and May 11, 2021. (*Id*. at 63-64, 75-104). During their session on April 13, 2021, Dr. Gomes advised Plaintiff that she would be presenting his case to the MH-CRC the following week to get approval to go over the 16 sessions authorized by the DOC Health Plan. (*Id*. at 102.) Plaintiff stated that it would be "stupid" for the MH-CRC to deny the request and that he would consider it retaliation and would immediately take action. (*Id*.) While the MH-CRC authorized additional sessions, they also discussed the fact that Plaintiff did not appear to be benefitting from treatment any longer and that they needed to work towards termination of his weekly sessions. (*See id*. at 127-28 (Gomes Dep. at 38:14-39:9).)

During Plaintiff's weekly therapy session on May 4, 2021, Dr. Gomes informed Plaintiff that because it appeared he had stopped benefitting from treatment, he was going to be moved to quarterly case management which would allow him time to practice the skills they had been working on during the weekly sessions. (*See* Feulner Decl. I, Ex. at 103, 143-44 (Gomes Dep. at 74:16-75:17), 152 (Drake Dep. at 33:11-18).) Dr. Gomes thereafter had individual therapy sessions with Plaintiff on May 11, 2021, and July 6, 2021. (*Id*. at 104-05.) On July 8, 2021, Dr. Gomes and Dr. Traci Drake, the Chief of Psychology at MCC, met with Plaintiff to discuss concerns related to his mental health treatment. (*Id*. at 106-07.) Dr. Gomes testified at her deposition that the meeting essentially involved Plaintiff yelling at them for 45 minutes about

REPORT AND RECOMMENDATION
PAGE - 12

why he disagreed with them and why their treatment plan for him was wrong. (*Id*. at 129 (Gomes Dep. at 40:9-22); *see also id*. at 106.) According to the mental health encounter report prepared by Dr. Gomes following this meeting, Plaintiff's presentation during the meeting confirmed that he had reached maximum benefit from treatment as he was not able to focus on treatment-relevant topics and continued to assert that his problems were largely external to him. (*Id*. at 106-07.)

C.    **Plaintiff's Claims**

Plaintiff identifies six claims for relief in his amended complaint. He first alleges that Dr. Davis, Dr. Rainer, and Ms. Watanabe violated his Eighth Amendment rights when they failed to evaluate, diagnose, and treat his mental health condition for over a year and when they failed to provide him medically necessary accommodations. (Am. Compl. at ¶ 117-122.) Plaintiff alleges in his second claim for relief that Dr. Davis, Dr. Rainer, and Ms. Watanabe retaliated against him for exercising his First Amendment rights to file grievances, lawsuits, and tort claims against Defendants and other DOC staff members. (*Id*. at ¶¶ 123-129.) Plaintiff alleges in his third claim for relief that all Defendants were negligent in failing to ensure that he received the mental health treatment his condition warranted and in failing to ensure that his DOC records were properly and accurately maintained. (*Id*. at ¶¶ 130-134.)

Plaintiff alleges in his fourth claim for relief that all Defendants, having direct knowledge of his mental health condition and distress, negligently prolonged and inflicted additional emotional distress by refusing to schedule, evaluate, diagnose, and treat him for nearly two years. (Am. Compl. at ¶¶ 135-137.) Plaintiff alleges in his fifth claim for relief that the DOC violated the ADA/RA when they failed to provide reasonable accommodations and other services related

REPORT AND RECOMMENDATION
PAGE - 13

1    to his mental impairments and denied him rights and benefits afforded other inmates. (*Id*. at

2    ¶¶ 138-151.) Finally, Plaintiff alleges in his sixth claim for relief that the State of Washington is

3    liable for the acts of its employees under a theory of *respondeat superior*. (*Id*. at ¶¶ 152-154.)

## III.    DISCUSSION

5    Defendants argue in their motion for summary judgment that Plaintiff has failed to raise

6    viable Eighth Amendment, First Amendment, and ADA/RA claims. (*See* Defs.' Mot. at 9-14,

7    18-21.) As to Plaintiff's First Amendment claims, Defendants also argue that Plaintiff failed to

8    exhaust his retaliation claim against Dr. Davis (*id*. at 8-9), and waived his retaliation claim

9    against Ms. Watanabe because he failed to identify any basis for such a claim in his discovery

10   responses (*id*. at 14). Defendants further argue that Plaintiff has not shown the individual

11   Defendants were personally involved in the maintenance of his criminal conviction records or

12   mental health records, and that they are entitled to qualified immunity with respect to Plaintiff's

13   constitutional claims. (*Id*. at 14-16). Finally, Defendants argue that Plaintiff has failed to raise

14   any viable state law claims (*id*. at 16-18), that Plaintiff has failed to show a viable theory under

15   *respondeat superior* (*id*. at 21), and that this Court should conclude Plaintiff's claims are

16   frivolous and malicious (*id*. at 22-24.)

17   **A.     Applicable Legal Standards**

18   *1.     Summary Judgment Standard*

19   Summary judgment is appropriate when a "movant shows that there is no genuine dispute

20   as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

21   56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party

22   fails to make a sufficient showing on an essential element of his case with respect to which he

23

REPORT AND RECOMMENDATION
PAGE - 14

has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving

party bears the initial burden of showing the district court "that there is an absence of evidence to

support the nonmoving party's case." *Id*. at 325. The moving party can carry its initial burden by

producing affirmative evidence that negates an essential element of the nonmovant's case, or by

establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of

persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102

(9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of

material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The

Court must draw all reasonable inferences in favor of the nonmoving party. *Id*. at 585-87.

        In supporting a factual position, a party must "cit[e] to particular parts of materials in the

record . . .; or show[] that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support the

fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there

is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at

585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)

(emphasis in original). The central issue is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *Id*. at 251-52.

        The opposing party must present significant and probative evidence to support its claim

or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

REPORT AND RECOMMENDATION
PAGE - 15

1   "The mere existence of a scintilla of evidence in support of the non-moving party's position is

2   not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d

3   1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with

4   allegations in the complaint, or with unsupported conjecture or conclusory statements."

5   *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

6            2.       *Section 1983 Standard*

7            In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that

8   she suffered a violation of rights protected by the Constitution or created by federal statute, and

9   (ii) that the violation was proximately caused by a person acting under color of state law. *See*

10  *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is

11  satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in

12  another's affirmative act, or omitted to perform an act which he was legally required to do that

13  caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981)

14  (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

15       **B.       Analysis**

16            1.       *Eighth Amendment: Inadequate Medical Care*

17            Plaintiff alleges in his first claim for relief that Dr. Davis, Dr. Rainer, and Ms. Watanabe

18  violated his Eighth Amendment rights when they failed to evaluate, diagnose, and treat his

19  mental health condition for over a year and when they failed to provide him medically necessary

20  accommodations. (Am. Compl. at ¶ 117-122.) Defendants argue that Plaintiff has failed to raise a

21  viable Eighth Amendment claim. (Defs.' Mot. at 9-12.)

22

23

REPORT AND RECOMMENDATION
PAGE - 16

The Eighth Amendment imposes a duty upon prison officials to provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This duty includes ensuring that inmates receive adequate food, clothing, shelter, and medical care, and taking reasonable measures to guarantee the safety of inmates. *Id*. In order to establish an Eighth Amendment violation for inadequate medical care, a plaintiff must demonstrate that he had a "serious medical need," and that defendants' response to that need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir.1991), *overruled on other grounds by WMX Techs., Inc. v. Miller,* 104 F.3d 1133 (9th Cir. 1997) (en banc)).

A prison official is deliberately indifferent to a serious medical need if he "knows of and disregards an excessive risk to inmate health." *Farmer*, 511 U.S. at 837. To be found liable under the Eighth Amendment, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

Deliberate indifference is a high legal standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). An inadvertent or negligent failure to provide adequate medical care is insufficient to establish a claim under the Eighth Amendment. *Estelle*, 429 U.S. at 105-06; *see also Farmer*, 511 U.S. at 835 ("ordinary lack of due care" is insufficient to establish an Eighth Amendment claim). Differences of opinion between a prisoner and prison medical staff or between medical professionals regarding the proper course of treatment does not give rise to a

REPORT AND RECOMMENDATION
PAGE - 17

§ 1983 claim. *Toguchi*, 391 F.3d at 1058. "[A] prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Id*. (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). When an inmate alleges an Eighth Amendment violation for inadequate medical care based upon delays in receiving treatment, he must demonstrate that he suffered substantial harm as a result of the delay. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990).

Defendants, for purposes of this motion, do not dispute that Plaintiff has a serious medical need. (Defs.' Mot. at 9.) At issue here is solely whether Defendants were deliberately indifferent to Plaintiff's needs. Defendants argue that Plaintiff has failed to show that his overall course of treatment by the DOC was medically unacceptable, or that any of the individual Defendants' actions were deliberately indifferent. (*Id.* at 9-12.) Plaintiff does not oppose Defendants' request for summary judgment with respect to any Eighth Amendment claim asserted against Dr. Rainer, suggesting that Plaintiff no longer intends to pursue such a claim.[5] The Court therefore addresses Plaintiff's Eighth Amendment claim only with respect to Dr. Davis and Ms. Watanabe.

---

[5] It is not clear from the facts alleged in Plaintiff's amended complaint what the basis of his Eighth Amendment claim against Dr. Rainer might be, and none of the alleged facts pertaining to Dr. Rainer appear to implicate Eighth Amendment concerns. Perhaps realizing the deficiencies with respect to this claim, Plaintiff elected not to pursue it in his response to Defendants' summary judgment motion. The claim should therefore be deemed abandoned. *See Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) ("We have previously held that a plaintiff has 'abandoned . . . claims by not raising them in opposition to [the defendant's] motion for summary judgment.'" (quoting *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)).)

REPORT AND RECOMMENDATION
PAGE - 18

Plaintiff claims that Dr. Davis and Ms. Watanabe failed to properly evaluate and treat his mental illness during his encounters with them in 2019. Dr. Davis and Ms. Watanabe, who saw and assessed Plaintiff in January, August, and September 2019, determined that the concerns raised by Plaintiff during his appointments with them, which included difficulty sleeping and anxiety, were attributable to "situational stressors" arising out of family concerns, conflicts with DOC staff, and legal actions Plaintiff was pursuing. (*See* Davis Decl. at ¶¶ 5, 7, 13; Watanabe Ex. at 5, 27.) Neither Dr. Davis nor Ms. Watanabe identified in Plaintiff's presentation any signs of serious mental illness that would have required ongoing treatment. (*See id*.)

Plaintiff faults both Dr. Davis and Ms. Watanabe for failing to complete a formal mental health assessment as he maintains that both Defendants were aware, or should have been aware, of his serious symptomology at the time of their encounters with him in 2019. (Pl.'s Resp. at 14-17.) Plaintiff argues, with respect to Dr. Davis, that Dr. Davis's current claim that he assessed Plaintiff during their January 2019 sessions is not reflected in his encounter reports of those sessions. (*Id*. at 15.) He further argues that the notes of those encounters, one of which suggested that a mental health update was overdue and one of which included two potential diagnoses that Dr. Davis intended to rule out, are inconsistent with Dr. Davis's representations in this action that he did not see any basis for changing Plaintiff's mental health code, which would have indicated a need for more services or for completing a formal evaluation. (*Id*. at 15-16.)

Plaintiff's argument to the contrary, the encounter reports are not inconsistent with Dr. Davis's representations that he assessed Plaintiff during their sessions. Indeed, the encounter report of the second session reflects exactly that, with Dr. Davis indicating that Plaintiff had returned to "continue his assessment." (Davis Ex. at 6.) The fact that Dr. Davis never completed

REPORT AND RECOMMENDATION
PAGE - 19

1   a full and formal mental health evaluation does not, as Plaintiff suggests, equate to a lack of

2   clinical assessment. The encounter reports are, likewise, not inconsistent with Dr. Davis's

3   representations here that he did not observe during his assessments any signs of serious mental

4   illness that would have warranted additional services. Dr. Davis did note in his second encounter

5   report that "[a]nxiety was in evidence," and he indicated an intention to clarify a diagnosis

6   related to that anxiety. (*Id.*) However, nothing in the record suggests that the anxiety Plaintiff

7   displayed during that second session was a sign of a serious mental illness that would have

8   warranted a change in Plaintiff's mental health code, and a corresponding entitlement to

9   additional services.

10         Indeed, Ms. Watanabe, who evaluated Plaintiff following his complaints about Dr.

11   Davis's lack of follow-up, noted Plaintiff's reports of "anxious distress" over the course of the

12   preceding 12-16 months, but attributed this distress, as well as Plaintiff's reports of trouble

13   sleeping, to "situational stressors" and not to any serious mental illness. (*See* Watanabe Ex. at 5,

14   27.) Ms. Watanabe also concluded, based on Plaintiff's presentation at the time of their

15   encounters, that Plaintiff did not need to have a full mental health appraisal conducted given the

16   absence of any signs that he was suffering from a major mood disorder. (*Id*. at 27.) While

17   Plaintiff suggests that Ms. Watanabe, in reaching this conclusion, overlooked signs of a

18   potentially serious diagnosis, the record does not support this suggestion.

19         The Court first notes that the conclusions of Dr. Davis and Ms. Watanabe that Plaintiff

20   was showing no signs of serious mental illness during their encounters in 2019 were consistent

21   with the conclusion rendered by Ms. Watanabe in June 2017 following an assessment she

22   conducted in relation to concerns about Plaintiff participating in extended family visits with his

23

REPORT AND RECOMMENDATION
PAGE - 20

1    children that Plaintiff displayed "no signs/symptoms of a major mood disorder or mental health

2    concern." (*Id*. at 2.) There is no indication that Plaintiff disputed that conclusion or deemed

3    further evaluation necessary, despite the fact that Plaintiff indicates in his declaration that he

4    believes the symptoms he reported to Dr. Davis and Ms. Watanabe in 2019 actually began

5    "around 2016." (Pl.'s Decl. at ¶ 10.)

6        The conclusions of Dr. Davis and Ms. Watanabe that Plaintiff was not displaying signs of

7    a serious mental illness were also consistent with the conclusion rendered by Ted Neiland, M.A.,

8    a mental health counselor employed by Plaintiff's family to conduct a psychosexual evaluation

9    of Plaintiff in April 2018 for purposes of assessing the appropriateness of allowing Plaintiff

10   contact with his minor children. (*See* Feulner Decl. I, Ex. at 167-69.) Mr. Neiland, following a

11   lengthy clinical interview with Plaintiff, determined that "there was no apparent evidence of a

12   thought or personality disorder." (*Id*. at 168.) Again, there is no indication in the record that

13   Plaintiff took issue with this conclusion.

14       In addition to the consistencies reflected in these various assessments, it is also notable,

15   in light of Plaintiff's suggestion that Defendants knew, or should have known, he was suffering

16   from a serious mental health condition, that Plaintiff indicated during his first appointment with

17   Dr. Davis that he didn't know why he was there, that his lawyer had told him to talk to mental

18   health, and that he didn't need to talk to anybody. (Davis Ex. at 2.) Likewise, during his second

19   appointment with Dr. Davis, Plaintiff suggested he was there because his sister and his lawyer

20   told him he should speak to someone. (*Id*. at 6.) Plaintiff also expressed some ambivalence

21   during that session about pursuing mental health treatment because of a concern about having his

22   issues documented. (*See id*.) When Plaintiff saw Ms. Watanabe for the first time in August 2019,

23

REPORT AND RECOMMENDATION
PAGE - 21

1   he actually self-reported that he was "doing pretty good right now" (*see* Watanabe Ex. at 5),

2   which does not square with his assertion that his serious mental health symptoms had been

3   overlooked.

4       The fact that subsequent to Plaintiff's encounters with Dr. Davis and Ms. Watanabe, Dr.

5   Gomes completed a full mental health appraisal of Plaintiff, diagnosed him with PSTD, and

6   initiated regular treatment, does not demonstrate deliberate indifference on the part of either Dr.

7   Davis or Ms. Watanabe. Dr. Davis and Ms. Watanabe, both of whom are trained mental health

8   professionals, were entitled to draw their own conclusions regarding the nature of Plaintiff's

9   mental health issues based on Plaintiff's presentation to them at the time of their interactions.

10  Even Dr. Gomes acknowledged during her deposition testimony that diagnosing Plaintiff was a

11  challenge, and took some time, "because of all the superfluous information that he was

12  providing." (Feulner Decl. I, Ex. at 114-15 (Gomes Dep. at 15:16-16:19).) Dr. Gomes testimony

13  undermines the suggestion that Defendants should necessarily have been aware of his "serious

14  symptomology."

15      Plaintiff's mere dissatisfaction with the methods used by Dr. Davis and Ms. Watanabe to

16  assess him, and their resulting conclusions, do not rise to the level of a constitutional violation.

17  And, while Plaintiff was ultimately diagnosed with a mental health disorder that entitled him to

18  additional services, including regular therapy sessions, there is no evidence in the record that the

19  delay in receiving such the diagnosis and associated services caused Plaintiff to suffer any

20  serious harm. Plaintiff fails to demonstrate that either Dr. Davis or Ms. Watanabe were

21  deliberately indifferent to his mental health needs and, thus, Defendants' motion for summary

22  judgment should be granted with respect to this claim.

23

REPORT AND RECOMMENDATION
PAGE - 22

### 2.    First Amendment: Retaliation

Plaintiff alleges in his second claim for relief that Dr. Davis, Dr. Rainer, and Ms. Watanabe retaliated against him for exercising his First Amendment rights. Plaintiff asserts that Dr. Davis retaliated against him by intimidating him and refusing to allow him to leave his office after Plaintiff filed a grievance complaining about Dr. Davis's failure to timely provide a mental health assessment. (Am. Compl. at ¶ 125; *see also* Feulner Decl. I, Ex. at 176.) Plaintiff further asserts that Defendants retaliated against him by continually failing to provide mental health treatment and blocking his attempts to obtain medically necessary accommodations because he initiated lawsuits against DOC and its staff. (Am. Compl. at ¶ 126.) Finally, Plaintiff asserts that Defendants retaliated against him by failing to remove or correct erroneous criminal conviction record ("CCR") information in his DOC file because he initiated lawsuits against DOC and its staff. (*Id*. at ¶ 127.)

A viable claim of First Amendment retaliation within the prison context has five basic elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

In order to prevail on a retaliation claim, "a plaintiff must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (citation and internal quotation omitted). In addition, a plaintiff "bears the burden of pleading and proving the absence of legitimate correctional goals for the

REPORT AND RECOMMENDATION
PAGE - 23

1    conduct of which he complains." *Pratt v. Rowland,* 65 F.3d 802, 806 (9th Cir. 1995). The Court

2    evaluates a retaliation claim in light of the deference accorded prison officials. *Id*. at 807.

3                                  a.    Dr. Davis

4            Defendants argue that Plaintiff failed to exhaust any retaliation claim related to his

5    August 2019 meeting with Dr. Davis. (Defs.' Mot. at 8-9.) Defendants argue it is uncontested

6    that the DOC has a grievance process, and that Plaintiff filed a grievance regarding the alleged

7    incident in Dr. Davis's office in August 2019, but that Plaintiff did not pursue the grievance all

8    the way through Level III of the grievance process as necessary for proper exhaustion. (Defs.'

9    Mot. at 9 (citing Feulner Decl. I, Ex. at 21-22 (Wright Dep. at 104:20-105:6).) Defendants

10   maintain that any claims related to this incident should therefore be dismissed for failure to

11   exhaust. (*Id*.)

12           The Prison Litigation Reform Act of 1996 ("PLRA") provides that "[n]o action shall be

13   brought with respect to prison conditions under section 1983 of this title, or any other Federal

14   law, by a prisoner confined in any jail, prison, or other correctional facility until such

15   administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Section 1997e(a)

16   requires *complete* exhaustion through any available process. *See Porter v. Nussle*, 534 U.S. 516,

17   524 (2002); *Booth v. Churner*, 532 U.S. 731, 735 (2001). Section 1997e(a) also requires *proper*

18   exhaustion. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper" exhaustion means full

19   compliance by a prisoner with all procedural requirements of an institution's grievance process.

20   *See id*. at 93-95.

21           Failure to exhaust administrative remedies is an affirmative defense which a defendant

22   must plead and prove. *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (citing *Jones v. Bock*,

23

REPORT AND RECOMMENDATION
PAGE - 24

549 U.S. 199, 216 (2007)). A defendant must produce evidence demonstrating that there was an available administrative remedy and that the prisoner did not exhaust that remedy. *Id*. at 1172. The burden then shifts to the prisoner who must show that there is something in his case that made the existing remedies effectively unavailable to him. *Id*. If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment. *Id*. at 1166.

The Ninth Circuit has recognized that acts by prison officials that prevent the exhaustion of administrative remedies may make administrative remedies effectively unavailable to a prisoner. *See Nunez v. Duncan*, 591 F.3d 1217, 1224-25 (9th Cir. 2010). Similarly, in *Ross v. Blake*, 578 U.S. 632 (2016), the United States Supreme Court held that § 1997e(a) requires an inmate to exhaust only those grievance procedures "that are capable of use to obtain some relief for the action complained of." *Id*. at 642 (citation and internal quotation marks omitted). The Supreme Court went on to note three circumstances in which an administrative remedy, although officially available, is not capable of use to obtain relief: (1) when the administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when the administrative scheme is "so opaque that it becomes practically speaking, incapable of use" because "no ordinary prisoner can discern or navigate it"; and (3) when prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 643-44.

Plaintiff appears to argue in his response to Defendants' exhaustion argument that administrative remedies were effectively unavailable to him because he was administratively barred from pursuing his grievance against Dr. Davis past Level I of the grievance process. (Pl.'s

REPORT AND RECOMMENDATION
PAGE - 25

Resp. at 11-12.) Plaintiff explains that he submitted his initial grievance regarding the August 2019 incident involving Dr. Davis on the day the incident occurred. (*Id*. at 12.) After being asked to provide a rewrite, and doing so, Plaintiff was told the issue was non-grievable because it was being addressed in a separate grievance. (*Id*. (citing Pl.'s Ex. at 32-33).) When Plaintiff later received a response to the separate grievance, it did not address Plaintiff's August 2019 meeting with Dr. Davis. (*Id*. (citing Pl.'s Ex. at 45).)

Plaintiff appealed the grievances and, in October 2019, was granted permission by the DOC's Grievance Program Manager to resubmit his grievance against Dr. Davis if he wished to pursue it. (Pl.'s Resp. at 12 (citing Pl.'s Ex. at 35).) Plaintiff asserts, however, that he was barred from pursing the grievance at that point because he already had five active grievances and had been advised that if he continued to file new grievances before his five active grievances were resolved he would be infracted for abuse of quantity. (*Id*. (citing Pl.'s Decl. at ¶ 19).) Plaintiff maintains that he had an in-person meeting about this issue with the grievance coordinator, Brandi Blair, and that Ms. Blair confirmed he would not be able to refile his grievance against Dr. Davis unless he withdrew one of his other active grievances. (Pl.'s Decl. at ¶ 19.)

Ms. Blair, in a declaration submitted in support of Defendants' reply to Plaintiff's response, states that she does not recall Plaintiff ever contacting her to tell her he wished to pursue the grievance against Dr. Davis, and that she has been unable to find any record of Plaintiff attempting to submit a re-write of that grievance after the Grievance Program Manager gave him permission to do so. (Blair Decl. at ¶ 8.) Ms. Blair also states that while the grievance office does sometimes issue an "abuse by quantity letter" when an individual submits more than five grievances, the first abuse by quantity letter found in DOC records pertaining to Plaintiff

REPORT AND RECOMMENDATION
PAGE - 26

was dated May 14, 2020, months after Plaintiff was granted permission to resubmit his grievance against Dr. Davis. (*Id*. at ¶ 9.) Ms. Blair goes on to state that her review of grievance records for Plaintiff during the relevant time period revealed that Plaintiff had only four open grievances at the time he was given permission to resubmit his grievance against Dr. Davis based on the August 2019 incident. (*Id*. at ¶ 10.)

Plaintiff's representations as they relate to the exhaustion issue are quite vague. Plaintiff does not identify when his meeting with Ms. Blair occurred, he does not describe what other grievances he had pending at the time he sought to resubmit his grievance against Dr. Davis, and he does not provide a copy of the "abuse by quantity letter" he claims to have received from Ms. Blair. However, there is some indication in the record that any interactions Plaintiff had with Ms. Blair regarding the resubmission of his grievance against Dr. Davis may not have occurred until June 2020, two months before he filed the instant lawsuit in state court and almost eight months after he was granted permission to resubmit his grievance.[6] This, at the very least, calls into question Plaintiff's diligence in attempting to pursue the grievance.

However, leaving aside the timing issue, and assuming, as Plaintiff asserts, that Ms. Blair advised him that he already had five grievances pending at the time he purportedly met with her to discuss the resubmission of his grievance against Dr. Davis, Plaintiff nonetheless fails to establish that he was administratively barred from exhausting the relevant grievance. Plaintiff's

---

[6] Ms. Blair submitted with her declaration a copy of a kite she received from Plaintiff on June 23, 2020, in which Plaintiff asked for a copy of the original grievance he filed against Dr. Davis. (*See* Blair Decl. at ¶ 11, Ex. at 12.) Plaintiff explained in his kite that "You told me to re-write it. I have the re-write. I am hoping for the first one I sent." (*Id*.) This kite, in combination with Ms. Blair's representation that an "abuse by quantity letter" was issued to Plaintiff in May 2020, suggests that Plaintiff may not have attempted to resubmit his grievance against Dr. Davis until the filing of the instant action was imminent.

REPORT AND RECOMMENDATION
PAGE - 27

suggestion to the contrary, the five grievances he claims were pending at the time he attempted to resubmit his grievance against Dr. Davis did not present an absolute impediment to Plaintiff's ability to exhaust his administrative remedies.

Plaintiff acknowledges that he could have pursued his grievance against Dr. Davis, despite the existence of five other pending grievances, by simply withdrawing one of those grievances. (Pl.'s Decl. at ¶ 19.) Plaintiff explained during his deposition testimony that he was unwilling to do this because it would have precluded him from exhausting his other grievances. (*See* Dkt. # 40, Ex. 1 at 5-6 (Wright Dep. at 104:20-105:6).) Plaintiff went on to state during his deposition testimony that "You're only allowed to withdraw so many a year without getting infracted, so I can't – I'm not going to withdraw one." (*Id*., Ex. 1 at 6 (Wright Dep. at 105:17-19).)

The evidence makes clear that Plaintiff had the option to withdraw one of his five pending grievances but made the decision that it was more important to him to exhaust his other pending grievances than it was to pursue the one pertaining to Dr. Davis. (*See* Dkt. # 40, Ex. 1 at 6 (Wright Dep. at 105:1-6, 17-19).) While Plaintiff had the right to make such a decision, he cannot now assign responsibility for his failure to exhaust his administrative remedies to prison officials. In sum, Plaintiff has not demonstrated that the administrative remedy procedure was unavailable to him for purposes of exhausting his grievance against Dr. Davis. This Court therefore concludes that Plaintiff's retaliation claim against Dr. Davis has not been properly exhausted, and that the claim must therefore be dismissed.

REPORT AND RECOMMENDATION
PAGE - 28

b.      Dr. Rainer

Defendants assert that Plaintiff's retaliation claim, as asserted in his amended complaint, is quite vague and that their attempts to clarify the nature of the claim through discovery was only modestly successful. (*See* Defs.' Mot. at 13; Feulner Decl. I, Ex. at 174-76.) Defendants are correct. However, Plaintiff appears to assert in his response to Defendants' discovery request on this issue that as a result of his complaints that he has been denied medically necessary treatment, as alleged in this lawsuit, in a tort claim he maintains he filed against Dr. Rainer, in grievances, and in a complaint to the Correctional Ombuds Office, Dr. Rainer has denied his requests for medically necessary treatment. (*See id*. at 174-75.) So far as the Court can discern, Plaintiff's retaliation claim against Dr. Rainer relates, in particular, to the MH-CRC's denial of his request for a no work programming HSR in July 2020, the accompanying recommendation of the MH-CRC that Plaintiff be reassessed to clarify his diagnosis, and the handling of Plaintiff's appeals of the MH-CRC's decision. (*Id*.)

Defendants argue that Dr. Rainer's alleged actions do not constitute a viable retaliation claim and they cite multiple reasons why they believe this to be so. (Defs.' Mot. at 13.) Specifically, Defendants assert that the denial of the HSR cannot be considered adverse action because the HSR was not medically necessary and was, in fact, contraindicated according to Plaintiff's treatment provider, Dr. Gomes. (*Id*.) Defendants further assert that Plaintiff cannot show that there is any connection between the decisions in question and his protected conduct, nor can he show that Dr. Rainer's actions failed to serve legitimate correctional goals. (*Id*.)

Plaintiff, in his response to Defendants' motion, notes that Dr. Rainer received a copy of a tort claim Plaintiff filed against the State and DOC in June 2020, and that she was directly

REPORT AND RECOMMENDATION
PAGE - 29

1    involved in responding to "several" of Plaintiff's Level III grievances regarding his care and his

2    records. (Pl.'s Resp. at 19.) Subsequently, Dr. Rainer was a member of the MH-CRC panel that

3    denied Plaintiff's request for an HSR in July 2020. (*Id*.) Plaintiff asserts that following review of

4    his HSR request, Dr. Rainer stopped his treatment, claiming that he was not actually mentally ill,

5    and ordered psychological testing. (*Id*.) Plaintiff also asserts that Dr. Rainer personally denied his

6    "HRT work deferral application" and delayed MH-CRC review of that decision, and that Dr.

7    Rainer thereafter personally denied his appeal of the decision. (*Id*.) Plaintiff claims that Dr.

8    Rainer interfered with his care and his attempts to appeal the MH-CRC decision after he filed the

9    instant lawsuit in August 2020, which named her as a Defendant, and he claims that it was only

10    after the Office of Corrections Ombuds held a meeting with DOC headquarters that Dr. Rainer

11    finally forwarded Plaintiff's appeal to an appeal panel to issue a decision. (*Id*.)

12        Plaintiff offers no evidentiary support for a majority of the arguments set forth in his

13    responsive brief with respect to his retaliation claim against Dr. Rainer, and some of the

14    arguments appear contradictory. The Court first notes that, while Plaintiff identified Dr. Rainer

15    as a person who was involved in, or a witness to, the incident alleged in the tort claim, Plaintiff

16    makes no specific reference to Dr. Rainer in the recitation of his tort claim. (*See* Feulner Decl. I,

17    Ex. at 183-89.) Plaintiff's assertion that he filed a tort claim *against* Dr. Rainer therefore appears

18    inaccurate.

19        Plaintiff also appears to claim that the MH-CRC panel denied his request for an HSR, and

20    that Dr. Rainer personally denied the request, apparently contradictory assertions. The record

21    demonstrates that the MH-CRC panel denied the request after Dr. Gomes, a non-defendant and

22    Plaintiff's mental health provider at the time, personally denied the request and then took the

23

REPORT AND RECOMMENDATION
PAGE - 30

1    matter to the MH-CRC at Plaintiff's insistence. (*See* Pl.'s Ex. at 55, 62-63, 65; *see also* Feulner

2    Decl. I, Ex. at 58-61.) There is no evidence that Dr. Rainer personally denied the request.

3           The record is also devoid of any evidence that Dr. Rainer personally stopped Plaintiff's

4    treatment, claimed Plaintiff was not mentally ill, or personally ordered psychological testing.

5    Rather, the record reflects that when Dr. Gomes sought review by the MH-CRC of Plaintiff's

6    request for a no-work HSR, she also sought consultation from the committee on the course of

7    Plaintiff's treatment given concerns about Plaintiff's progress in therapy and a request by

8    Plaintiff for additional weekly treatment time. (*See* Feulner Decl. I, Ex. at 61, 66.)

9           According to a mental health encounter report authored by Dr. Gomes following her

10   presentation of Plaintiff's case to the MH-CRC, the "MH-CRC members" expressed concerns

11   and provided recommendations, including that Dr. Gomes complete psychological testing for

12   purposes of clarifying Plaintiff's diagnosis before continuing with therapy. (Feulner Decl. I, Ex.

13   at 61.) This recommendation was based on Dr. Gomes' assessment that Plaintiff appeared to be

14   displaying more "personality pathology" than he had at the beginning of his treatment, and a

15   suggestion that the difficulties Plaintiff was experiencing may be more properly attributed to

16   traits of a personality disorder. (*Id*.) The fact that the MH-CRC took steps to clarify Plaintiff's

17   diagnosis to ensure proper and effective treatment cannot be deemed adverse action by the

18   committee, or by Dr. Rainer individually. Moreover, Plaintiff offers no evidence whatsoever that

19   the MH-CRC's actions were undertaken in response to Plaintiff's protected activities rather than

20   in response to concerns raised by Dr. Gomes in relation to Plaintiff's progress in therapy as the

21   record appears to indicate. (*See id*. at 61, 66.)

22

23

REPORT AND RECOMMENDATION
PAGE - 31

1    Finally, as to Plaintiff's appeals of the MH-CRC's decision denying Plaintiff's no work

2    HSR, Plaintiff does not present any evidence that Dr. Rainer personally denied the appeal. While

3    the record shows that there were delays in processing the appeal, Plaintiff fails to demonstrate

4    that the delay constitutes adverse action which would support a claim of retaliation. He also fails

5    to demonstrate that the delay was motivated by protected conduct, or that it had any adverse

6    impact on Plaintiff's treatment. In sum, Plaintiff fails to demonstrate that Dr. Rainer engaged in

7    any conduct which might reasonably support his claim of retaliation against her. Defendants'

8    motion for summary judgment with respect to the retaliation claim asserted against Dr. Rainer

9    should therefore be granted.

10                    c.    Jennifer Watanabe

11    Plaintiff asserts in his amended complaint that Ms. Watanabe retaliated against him for

12    exercising his First Amendment rights. (*See* Am. Compl. at 21.) He fails, however, to make clear

13    the facts and/or theory he is relying on to support such a claim. Defendants argue that Plaintiff

14    abandoned his retaliation claim against Ms. Watanabe when he failed to identify any basis for

15    such a claim in his discovery responses. (Defs.' Mot. at 14.) Plaintiff offers no argument to the

16    contrary in his response to Defendants' motion and the evidence in the record does not suggest,

17    much less demonstrate, that any of the actions taken by Ms. Watanabe in relation to Plaintiff's

18    mental health care constitute adverse action or were motivated by Plaintiff's protected conduct.

19    Plaintiff's purported retaliation claim against Ms. Watanabe should therefore be dismissed.

20                    d.    CCR Records

21    Finally, to the extent Plaintiff alleges in his second claim for relief that Defendants

22    retaliated against him by failing to remove or correct erroneous criminal conviction record

23

REPORT AND RECOMMENDATION
PAGE - 32

("CCR") information from his DOC file (Am. Compl. at ¶ 127), he fails to set forth facts demonstrating that the Defendants implicated in his retaliation claim; *i.e.*, Dr. Davis, Dr. Rainer, and Ms. Watanabe, had any involvement in, or responsibility for, the maintenance of such records. During his deposition, when Plaintiff was asked about the involvement of these individuals in his request to remove purportedly inaccurate information from his CCR, Plaintiff stated that these Defendants would be involved if they had accessed the records to assess him because that would mean Defendants knowingly used false information since he had previously prevailed on a grievance stating the information was false. (*See* Feulner Decl. I, Ex. at 22 (Wright Dep. at 114:13-23).) Plaintiff concluded his response to the question regarding Defendants' involvement in his CCR records by stating "So I would say that any—maybe they were; maybe they weren't, I guess." (*See id*.)

In his response to Defendants' summary judgment motion, Plaintiff does not challenge Defendants' argument that he will not be able to present any evidence that these three Defendants were involved in the handling of his CCR information and, indeed, he presents no evidence to support this claim. Thus, any retaliation claim pertaining to Plaintiff's CCR records must be dismissed.

### 3.    *Americans with Disabilities Act/Rehabilitation Act*

Plaintiff alleges in his fifth claim for relief that the DOC violated the ADA/RA when they failed to provide him with reasonable accommodations and other services related to his disabilities; *i.e.*, his mental impairments, and when they denied him the rights and benefits given to other inmates by reason of his disabilities. (*See* Am. Compl. at ¶¶ 138-151.) Plaintiff asserts in his amended complaint that the DOC substantially delayed, and sometimes stopped, his mental

REPORT AND RECOMMENDATION
PAGE - 33

treatment for months at a time, causing him significant emotional and psychological distress. (*Id.* at ¶ 145.) Plaintiff also asserts that he made Defendants aware of his need for a reasonable accommodation by repeatedly communicating to defendants his "medical condition and medically necessary accommodation requests." (*Id.* at ¶ 147.)

Title II of the ADA and § 504 of the RA both prohibit discrimination on the basis of disability. The ADA applies only to public entities, whereas the RA proscribes discrimination in all federally funded programs. To establish a violation of Title II of the ADA, a plaintiff must show that (1) he is a qualified individual with a disability; (2) he was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities; and (3) such exclusion or discrimination was by reason of his disability. *Lovell v. Chandler*, 303 F.3d 1039, 1053 (9th Cir. 2002) (citing *Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)). Similarly, to establish a violation of § 504 of the RA, a plaintiff must show that (1) he is an individual with a disability; (2) he is otherwise qualified for the benefit or services sought; (3) he was denied the benefit or services solely by reason of his disability; and (4) the program providing the benefit or services receives federal financial assistance. *See id.*

Defendants argue that Plaintiff has not raised a viable ADA claim, and they go on to identify two ADA theories they believe Plaintiff to have articulated in his amended complaint: "(1) the alleged delay and stopping of Wright's treatment and (2) the denial of an accommodation that would allow Wright to have a single-cell and not work." (*See* Defs.' Mot. at 20 (citing Am. Compl. at ¶¶ 145, 147).) Defendants also note that Plaintiff alleges in his

REPORT AND RECOMMENDATION
PAGE - 34

amended complaint a claim under the ADA arising out of the DOC's refusal to treat him for his anti-social personality disorder. (*Id.* (citing Am. Compl. at ¶ 149).)

While Defendants reasonably interpreted Plaintiff's ADA claim based on the factual assertions set forth in the amended complaint and Plaintiff's statement therein of his ADA/RA claim, Plaintiff offers what appears to be a modified version of his claim in his response to Defendants' motion. Plaintiff begins by stating that he intends to assert the following two claims under the ADA: (1) "that he was discriminated against with respect to providing him an assessment because part of his claims of mental illness emanated from conduct by prisoner officials," and (2) "that he was denied an accommodation based on this same mental illness." (Pl.'s Resp. at 20.)

Plaintiff then goes on to describe his discrimination claim as relating to Defendants' decision in July 2021 to address his mental health issues "by simply giving him a book to read and follow, which he cannot do because of a life-long learning disability." (*Id.* at 21.) Plaintiff claims in his response that because of his inability to read and comprehend the treatment book he was provided, "he has been effectively denied access to DOC mental health services." (*Id.*). With respect to his claim that he was denied a reasonable accommodation, he maintains that an HSR allowing him not to work was necessary because his job interfered with "his ability to synthesize the work he was doing in his in-person treatment sessions" and "severely impeded his ability to complete his between-session reading and workbook assignments." (*Id.* at 21-22.)

Defendants argue in their reply to Plaintiff's response that, to the extent Plaintiff premises his ADA claims on a theory that he has not been accommodated for his purported reading difficulties, his claim is not properly a part of this case because the theory was not raised in his

REPORT AND RECOMMENDATION
PAGE - 35

1   amended complaint. (Defs.' Reply at 9-10.) Defendants correctly note that the events which give

2   rise to this theory occurred in July 2021, well after the amended complaint was filed, and are

3   therefore not properly a part of this case. (*Id*.) As the Ninth Circuit has stated, "where . . . the

4   complaint does not include the necessary factual allegations to state a claim, raising such claim

5   in a summary judgment motion is insufficient to present the claim to the district court." *Navajo*

6   *Nation v. U.S. Forest Service*, 535 F.3d 1058, 1080 (9th Cir. 2008).

7          Not only is Plaintiff's claim pertaining to alleged learning difficulties a new claim, and

8   therefore not properly before the Court, there is also reason to doubt the veracity of the claim. As

9   Defendants point out in their reply brief, despite Plaintiff's claimed reading difficulties, he has

10  written two books while in prison and has held himself out as a published author. (Defs.' Reply

11  at 9 n.3 (citing Feulner Decl. II, Ex. at 9-10).) In addition, as Dr. Gomes explained during her

12  deposition testimony, the treatment book Plaintiff claims he couldn't read or understand was a

13  book he had been working out of and talking to her about for a year, and he had even

14  acknowledged to her that the book had been helpful to read and work through. (Feulner Decl. I,

15  Ex. at 125 (Gomes Dep. at 36:2-16).) Dr. Gomes observed that Plaintiff only began claiming he

16  couldn't understand the book after his weekly therapy sessions had been terminated and he was

17  placed on case management where Dr. Gomes wanted him to focus on reading and practicing

18  some of the things they had discussed in their sessions. (*Id*. at 125 (Gomes Dep. at 36:17-20),

19  126-27 (Gomes Dep. at 37:20-38:13).)

20         With respect to the denial of Plaintiff's HSR for no work programming, Defendants argue

21  that though Plaintiff claims the accommodation is necessary, he provides no evidence, aside

22  from his own self-serving testimony, to support that claim. (Defs.' Reply at 9.) Dr. Gomes, and

23

REPORT AND RECOMMENDATION
PAGE - 36

another non-defendant, Dr. Drake, both provided deposition testimony in which they stated that the HSR was not necessary and was, in fact, contraindicated for someone such as Plaintiff who was suffering from PTSD. (Feulner Decl. I, Ex. at 121-22 (Gomes Dep. at 32:1-33:10), 156-57 (Drake Dep. at 41:8-42:1).)

Dr. Gomes explained, in relation to the MH-CRC's decision to deny the HSR, that there was "no clinically acceptable or ethical way" for anyone on the committee to say that "it was a good idea to write a document that said that he could avoid something that was making him anxious because that would maintain rather than mitigate his PTSD symptoms. (*See* Feulner Decl. I, Ex. at 121 (Gomes Dep. at 32:16-24).) Dr. Drake similarly stated that "it would not be clinically indicated to give an HSR for no work for someone suffering from posttraumatic stress disorder." (*Id*. at 156 (Drake Dep. at 41:17-20).) She went on to explain that "what you want to do is teach somebody how to manage their responses in the face of the triggers so that they can move through that and not have it be disruptive to their lives any longer," because avoiding the triggers "only make[s] it worse." (*Id*. at 156-57 (Drake Dep. at 41:21-42:1).) Plaintiff offers no expert testimony of his own to contradict that of Dr. Gomes and Dr. Drake that the requested accommodation was not necessary and was, indeed, contraindicated.

Defendants correctly argue in their motion papers that Plaintiff has not stated a viable ADA/RA claim. Defendants are therefore entitled to summary judgment with respect to that claim.

### 4.    *Respondeat Superior*

Plaintiff alleges in his sixth claim for relief that the individual Defendants named in this action were acting within scope of their employment with the State of Washington when they

REPORT AND RECOMMENDATION
PAGE - 37

engaged in the misconduct alleged elsewhere in the amended complaint, and that the State of Washington is therefore liable for their actions. (Am. Compl. at ¶ 153.) As Defendants correctly note, *respondeat superior* is a theory of liability and not an independent tort. (Defs.' Mot. at 21.) Moreover, as Plaintiff has not established that any of his federal claims against the individual Defendants are legally sufficient, any claims based on a corresponding theory of *respondeat superior* necessarily fail.

### 5.    State Law Negligence Claims

Finally, Plaintiff asserts in his amended complaint two state law negligence claims. (*See* Am. Compl. at ¶¶ 130-137.) The Supreme Court has stated that federal courts should refrain from exercising their pendent jurisdiction when the federal claims are dismissed before trial. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Because Plaintiff's federal claims are subject to dismissal based upon his failure to establish any violation of his federal constitutional or statutory rights, the Court declines to exercise jurisdiction over Plaintiff's state law claims.

### 6.    Defendants' Motion to Strike

Defendants, in their reply to Plaintiff's response to their summary judgment motion, move to strike various statements contained in Plaintiff's declaration which they argue constitute hearsay or were conclusory in nature. (*See* Defs.' Reply at 2.) They also move to strike conclusory statements contained in the declaration of Theodora Wright. (*Id*. at 2-3.) The Court, in ruling on Defendants' summary judgment motion, did not rely on any of the portions of Plaintiff's declaration to which Defendants specifically objected in their motion to strike, nor did it rely at all on Theodora Wright's declaration. The Court therefore sees no need to address in

REPORT AND RECOMMENDATION
PAGE - 38

1  detail Defendants' specific objections or to comb through the declarations looking for

2  objectionable content to strike.

3          **7.**    *Defendants' Request for Finding of Frivolousness/Maliciousness*

4          Defendants, in their motion papers, ask the Court to make a finding that Plaintiff claims

5  are frivolous and malicious. (*See* Defs.' Mot. at 22-24; *see also* Defs.' Reply at 12.) The Ninth

6  Circuit has defined a "frivolous" case as one "of little weight or importance: having no basis in

7  law or fact." *Andrews v. King*, 398 F.3d 1113, 1121 (9th Cir. 2005) (citations omitted). A

8  separate standard for maliciousness is not well established but includes an action that "is plainly

9  abusive of the judicial process or merely repeats pending or previously litigated claims." *Abdul-*

10  *Akbar v. Department of Corrections*, 910 F. Supp. 986, 999 (D. Del. 1995).

11          As the claims asserted in this action have no apparent basis in law or fact, the Court has

12  no difficulty concluding that the instant action is frivolous. This conclusion is reinforced by the

13  fact that Plaintiff abandoned or substantially changed claims at the summary judgment stage of

14  the case when Defendants challenged their viability. With respect to the issue of maliciousness,

15  the Court observes that Plaintiff has brought two prior actions against the Washington DOC and

16  its employees which were dismissed as frivolous. *See Wright v. Dep't of Corrs.*, C19-1633-RSM,

17  2020 WL 7385829, at *1 (W.D. Wash. Dec. 16, 2020) (finding Plaintiff's claims frivolous);

18  *Wright v. Washington*, C18-927-RAJ, 2020 WL 3103893, *2 (W.D. Wash. June 11, 2020)

19  (amended complaint and action dismissed in their totality as frivolous). Though this pattern of

20  frivolous litigation is concerning, the Court does not have sufficient information regarding

21  Plaintiff's motivation in filing the instant action to make a finding that the action is malicious,

22  and therefore declines to do so.

23

REPORT AND RECOMMENDATION
PAGE - 39

## IV.    CONCLUSION

Based on the foregoing, this Court recommends that Defendants' motion for summary judgment (dkt. # 30) be GRANTED, and that Plaintiff's amended complaint (dkt. # 26) and this action be dismissed with prejudice as to Plaintiff's federal claims and without prejudice as to Plaintiff's state law negligence claims. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **February 4, 2022**.

DATED this 18th day of January, 2022.

MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 40